## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
### DIVISION OF ST. THOMAS AND ST. JOHN

| | |
|---|---|
| MILLENTINE COATES,        ) | |
|           ) | |
|        **Plaintiff,**     ) | |
|           ) | |
|        v.           ) | **Case No. 3:21-cv-0063** |
|           ) | |
| **FORD MOTOR COMPANY and XYZ**        ) | |
| **CORPORATION,**        ) | |
|           ) | |
|        **Defendants.**     ) | |

## ATTORNEYS:

**ROBERT L. KING, ESQ.**
THE KING LAW FIRM, PC
St. Thomas, VI

**JEFFREY T. MEYERS, ESQ.**
MEYERS LAW, PLLC
Dearborn, MI
      *For Plaintiff Millentine Coates*

**GAYLIN VOGEL, ESQ.**
BARNES, D'AMOUR & VOGEL
St. Thomas, VI

**SCOTT A. RICHMAN, ESQ.**
**COURTNEY M. KING, ESQ.**
**JENNIFER E. NOLANDER, ESQ.**
MCDONALD TOOLE RICHMAN & CORRENTI, P.A.
Orlando, FL
      *For Defendant Ford Motor Company*

## MEMORANDUM OPINION

**Robert A. Molloy,** *Chief Judge.*

     **BEFORE THE COURT** is Defendant Ford Motor Company's Motion for Summary Judgment. (ECF No. 412.) For the reasons stated below, the Court will grant the motion.

### I. FACTUAL BACKGROUND

This matter arises from a single-automobile collision that occurred on the evening of September 22, 2016, while Plaintiff, Millentine Coates ("Coates" or "Plaintiff"), was driving her 2002 Ford Explorer on Weymouth Rymer Highway in St. Thomas, U.S. Virgin Islands. The collision took place just as Coates was approaching the intersection of Estate Raphune Road. According to Coates, she was driving home from work when the airbags in her car suddenly deployed—hitting her and filling her vehicle with smoke. Coates claims the alleged spontaneous deployment and subsequent smoke disoriented her, causing her to lose control of the Ford Explorer, cross over into the oncoming westbound lane, and, ultimately, crash into the adjacent hillside, resulting in significant bodily injuries to her. Coates claims that, at the time of the collision, the weather was clear, traffic was light, and she was not otherwise distracted. She contends that, were it not for the spontaneous deployment of the airbags, the accident would not have occurred.

Coates believes the airbags in her vehicle deployed without provocation due to a defect in her vehicle's Restraint Control Module ("RCM")—the device responsible for commanding the Ford Explorer's airbags to deploy. As a result of the alleged defect, Coates filed the instant lawsuit against Ford Motor Company ("Ford") and a fictitious defendant[1] asserting the claims of strict product liability, negligence, breach of contract, and breach of implied warranties. *See* Second Amended Complaint ("SAC") (ECF No. 18.) The sole remaining claim is Count I, alleging a cause of action for strict liability.

Ford disagrees that Coates' airbags spontaneously deployed prior to the vehicle's impact with the hillside. Ford contends that the airbags deployed as intended and designed when the vehicle crashed into the hillside and that the collision resulted from Coates' negligent driving prior to the crash.

---

[1] Because discovery has closed and Plaintiff has not identified this defendant nor moved to amend the caption and substitute a properly named defendant, the Court hereby dismisses Defendant XYZ Corporation. *See, e.g., Christian v. Hamilton Jewelers*, CIVIL ACTION NO. 11-00518 (JEI/KMW), 2014 U.S. Dist. LEXIS 53343, at *12 n.7 (D.N.J. Apr. 17, 2014) ("Although '[u]se of John Doe defendants is permissible in certain situations until reasonable discovery permits the true defendants to be identified,' these parties must be dismissed if such discovery does not reveal their proper identities. . . . Accordingly, the fictitious entities and organizations listed as Defendants are dismissed.") (citation omitted)).

In a typical case, a dispute over an alleged defective airbag deployment can be resolved simply by reviewing the data recorded by the RCM. The experts can review the data to determine both when the airbags deployed and when the crash occurred. If the airbags were commanded to deploy at the time of impact, then the RCM data would all but conclusively rebut a claim of spontaneous deployment. However, if the air bags were not commanded to deploy, there is a relatively high likelihood that there was some kind of defect or other malfunction. However, here, it is undisputed that the RCM failed to record any crash data, including any record of an airbag deployment.

On December 1, 2023, Ford filed the instant motion for summary judgment seeking to dismiss Coates' SAC in its entirety. Ford argues that, except for the absence of crash data on the RCM, Coates lacks any evidence that her vehicle's airbags spontaneously deployed other than her own self-serving testimony. In her opposition, Coates claims that she has offered evidence that excludes other explanations for the alleged spontaneous deployment of the airbags or, at the very least, presents evidence sufficient to create a genuine dispute of material fact.

On April 2, 2024, the Court held an omnibus hearing wherein the Court heard arguments on Ford's motion for summary judgment.

## II. LEGAL STANDARD

A party may move for summary judgment at any time until thirty days after the close of all discovery, and the court shall grant the same if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a)-(b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party bears "the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp.*, 477 U.S. at 323.

Alternatively, the moving party may satisfy their initial burden by demonstrating that "there is an absence of evidence to support the nonmoving party's case." *Id.* at 325; *see* Fed. R. Civ. P. 56(c)(1)(B) ("A party asserting that a fact cannot be or is genuinely disputed must

support the assertion by showing . . . that an adverse party cannot produce admissible evidence to support the fact").

If the movant sufficiently satisfies their initial obligation, the burden shifts to the "[n]onmovant to 'go beyond the pleadings and by [their] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there *is* a genuine issue for trial.'" *Daubert v. NRA Group, LLC*, 861 F.3d 382, 391 (3d Cir. 2017) (quoting *Celotex*, 477 U.S. at 324) (emphasis added and internal quotations marks omitted by the *Daubert* court). A dispute is "genuine" if it could lead a "reasonable jury [to] return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it will "affect the outcome of the suit under the governing law." *Id.*

When deciding the existence of a genuine dispute of material fact, a court must resolve all reasonable "inferences, doubts, and issues of credibility . . . against the moving party." *Meyer v. Riegel Prods. Corp.*, 720 F.2d 303, 307 n.2 (3d Cir. 1983); *see Daubert*, 861 F.3d at 388-89 (citing *Steele v. Cicchi*, 855 F.3d 494, 500 (3d Cir. 2017)). Thus, when considering a motion for summary judgment, a court's role is not to weigh the evidence. Instead, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52. A court must grant summary judgment against any party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### III. DISCUSSION

Because Coates has abandoned the claims in Counts III, IV, and V, and the Court has dismissed Count VI of the Second Amended Complaint, *see* Order (ECF No. 465), and because at the hearing, counsel for Coates conceded that Count II is barred by the statute of limitations (*see* Tr. of Evidentiary Hearing (ECF No. 545 at 330-31), Count I of the Second Amended Complaint is Coates' only remaining claim. This count alleges various vehicle defects and concludes, "As a direct and proximate result of Defendants' action or non-action,

Defendants' are strictly liable to the Plaintiff for all damages suffered, past, present, and future." SAC at ¶54.

### A. Restatement (Third) of Torts: Product Liability, Section 2

For strict product liability claims, the Virgin Islands has formally adopted Sections 1 and 2 of the Third Restatement of Torts. *Banks v. Int'l Rental & Leasing Corp*, 55 V.I. 967, 985 (2011); *Davis v. UHP Projects, Inc.*, 74 V.I. 525, 532 (2021). Therefore, in this jurisdiction, "those engaged in the business of selling or otherwise distributing products are subject to strict liability for harm caused by a defective product." *Davis*, 74 V.I. at 532. Under Section 2:

> A product is defective when, at the time of sale or distribution, it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. A product:
>
> (a) Contains a manufacturing defect when the product departs from its intended design even though all possible care was exercised in the preparation and marketing of the product;
>
> (b) Is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe;
>
> (c) Is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.

*Id.* (quoting RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY, § 2).

Here, the defect alleged is the purported "spontaneous" deployment of the vehicle's airbags that Coates attributes to a defective RCM, the device that controls the airbags. The only evidence offered by Plaintiff of a product defect is the non-recording of either deployment or crash event by the RCM. Coates alleges both a design defect and a product defect.[2]

### 1. Design Defect

---

[2] In her Opposition and confirmed at the motion hearing, Coates abandoned her warning defect claim. *See* Opp'n (ECF No. 450) and Tr. of Evidentiary Hearing (ECF No. 545) at 282-85.

The allegedly defective product at issue in this case is the device responsible for commanding the deployment of the airbags—the RCM. As indicated in the Third Restatement, to establish a prima case for a design defect, typically, the plaintiff must show both that the risk of injury to the plaintiff was foreseeable and that the foreseeable risk posed by a design could have been reduced by an alternative design. RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY, § 2(b). Although the spontaneous deployment of the airbags poses a more than reasonably foreseeable risk of injury to the vehicle's operator, Coates has failed to identify a specific reasonably alternative design to the RCM nor has she identified the defect in the RCM's design that caused the injury.[3] Therefore, Coates lacks the traditional evidence to support a theory for a design defect.

### 2. Manufacturing Defect

Coates faces similar evidentiary problems with her manufacturing defect theory. To proceed under a manufacturing defect theory of liability, a plaintiff must show that the product departed from its intended design. RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY, § 2(a). However, to meet this requirement, a plaintiff must specifically identify the nature and identity of the defect before she may assert such a theory at trial—a bald assertion that a manufacturing error caused a defect is insufficient. *See, e.g., Bavone v. Primal Vantage Co*., 718 F. Supp. 3d 446, 455 (W.D. Pa. 2024) (stating that "'[a] manufacturing defect can be established by direct evidence of "a breakdown in the machine or a component thereof" (quoting *Chandler v. L'Oreal USA, Inc*., 340 F. Supp. 3d 551, 564 (W.D. Pa. 2018) (quoting *Smith v. Howmedica Osteonics Corp*., 251 F. Supp. 3d 844, 851 (E.D. Pa. 2017)))." In this case, Coates has not identified how the RCM was defectively manufactured, what component of the RCM broke down, and/or how that specific defect directly led to her alleged injuries. Thus, Coates has no evidence to support a theory for a manufacturing defect.

---

[3] *See* Ford's Statement of Undisputed Material Facts in Support of its Motion for Summary Judgment ("SUMF") (420-1) at ¶ 30 (citing Coates' expert Chris Caruso's final report stating that safer alternative designs were available and could have been utilized by Ford) and ¶ 31 ("Despite these opinions, Mr. Caruso testified at deposition that he is 'not specifically saying there's anything wrong with the specific design of the crash sensing system.' Exhibit C, Caruso depo. at 97:23-25. He also testified that he does not 'critique the 2002 design as being defective technologically.' *See id.* at 121:14-15.")

*Coates v. Ford Motor Co.*
Case No. 3:21-cv-0063
Memorandum Opinion
Page 7 of 21

## B. Restatement (Third) of Torts: Product Liability, Section 3 (Malfunction Theory)[4]

Notwithstanding Coates' failure to satisfy the prima facie requirements for a design defect or a manufacturing defect theory of product liability, Coates maintains that her strict product liability claim is viable under Section 3 of the Restatement (Third) of Torts. Section 3, titled, "Circumstantial Evidence Supporting Inference of Product Defect," provides:

> It may be inferred that the harm sustained by the plaintiff was caused by a product defect existing at the time of sale or distribution, without proof of a specific defect, when the incident that harmed the plaintiff:
>
> (a) was of a kind that ordinarily occurs as a result of product defect; and
>
> (b) was not, in the particular case, solely the result of causes other than product defect existing at the time of sale or distribution.

RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY, § 3.

According to the Section comments, "Section 3 claims are limited to situations in which a product fails to perform its manifestly intended function, thus supporting the conclusion that a defect of some kind is the most probable explanation." RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY, § 3, cmt. b. As noted in the comments and illustrations accompanying the Section, "Some courts refer to the rule in this Section as the "malfunction doctrine." RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY, § 3, cmts. b and c, Note 1.

Applying this theory to the facts and evidence in this case, the Court bears in mind the cautionary words of the Supreme Court of Nebraska:

> The malfunction theory should be utilized with the utmost of caution. Although some circumstances may justify the use of the malfunction theory to bridge the gap caused by missing evidence, *the absence of evidence does not make a fact more probable* but merely lightens the plaintiff's evidentiary burden despite the fact that the missing evidence might well have gone either way, and this rationale is too often subject to misapplication by courts in situations in which evidence is actually available. . . . The malfunction theory is narrow in scope. The malfunction theory simply provides that it is not

---

[4] Although Ford argues that the Virgin Islands Supreme Court has not formally adopted Section 3 of the Third Restatement of Torts, the Court believes Section 3 also is good law in the Virgin Islands. In *Davis*, after specifically adopting Restatement (Third) of Torts, § 2, the Virgin Islands Supreme Court notes that "the same analysis that supports adoption of the rule set forth in section 2 would also support adoption of the rule set forth in section 3." *Davis*, 74 V.I. at 534 n.3; *see also Tutein v. Ford Motor Company*, 76 V.I. 34, 46 (Super. Ct. 2016) (finding that "Section 3 is the soundest rule for the Virgin Islands"). Thus, the Court has no hesitation applying the Restatement (Third) of Torts: Product Liability, § 3, in the matter at bar.

necessary for the plaintiff to establish a specific defect so long as there is evidence of some unspecified dangerous condition or malfunction from which a defect can be inferred—the malfunction itself is circumstantial evidence of a defective condition. *The malfunction theory does not alter the basic elements of the plaintiff's burden of proof and is not a means to prove proximate cause or damages.*

*Roskop Dairy, L.L.C. v. GEA Farm Techs., Inc*., 871 N.W.2d 776, 796-97 (Neb. 2015) (footnotes omitted) (emphasis added).

### 1. Lost or destroyed

Ford contends that Coates cannot recover on a malfunction theory of liability because no evidence was "lost or destroyed." Mem. at 3 and 11. As articulated in the Section's comments:

The most frequent application of this Section is to cases involving manufacturing defects. When a product unit contains such a defect, and the defect affects product performance so as to cause a harmful incident, in most instances it will cause the product to malfunction in such a way that the inference of the product defect is clear. . . . Frequently, the plaintiff is able to establish specifically the nature and identity of the defect and may proceed directly under § 2(a). But when the product unit involved in the harm-causing incident is *lost or destroyed* in the accident, direct evidence of specific defect may not be available. Under that circumstance, this Section may offer the plaintiff the only fair opportunity to recover.

RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY, § 3, cmt. b (emphasis added); *Hurst v. Jarden Corp*., Case No. 2:22-cv-03857-JDW, 2023 U.S. Dist. LEXIS 198635, at *2 (E.D. Pa. Aug. 25, 2023)[5] ("[W]hen a product is destroyed or otherwise unavailable—as is often the case with

---

[5] Although it appears that the courts of Pennsylvania have not formally adopted Section 3 of the Third Restatement of Torts, they do recognize the malfunction theory of strict product liability:

In certain cases of alleged manufacturing defects, however, the plaintiff need not present direct evidence of the defect. When proceeding on a malfunction theory, the plaintiff may "present a case-in-chief evidencing the occurrence of a malfunction and eliminating abnormal use or reasonable, secondary causes for the malfunction." *O'Neill v. Checker Motors Corp.,* 389 Pa. Super. 430, 435, 567 A.2d 680, 682 (1989). See also: *Knight v. Otis Elevator Co.,* 596 F.2d 84, 89 (3d Cir. 1979). From this circumstantial evidence, a jury may be permitted to infer that the product was defective at the time of sale. *Vernon v. Stash, supra* at 48, 532 A.2d at 448.

*Ducko v. Chrysler Motors Corp*., 639 A.2d 1204, 1205 (Pa. Super. Ct. 1994). Pennsylvania courts, as well as others, analyze the malfunction theory of strict product liability under Restatement (Second) of Torts, § 402A. *See Rogers v. Johnson & Johnson Products, Inc*., 565 A.2d 751, 754 (Pa. 1989) (where the court declares: "Since *Webb v. Zern*, 422 Pa. 424, 220 A.2d 853 (1966), this Court has recognized a plaintiff's right to pursue an action in strict liability against the manufacturer of a product pursuant to section 402A of the *Restatement (Second)*

fire damage—the plaintiff may prove the defect's existence by circumstantial evidence of a malfunction" (citation omitted)); *Ellis v. Beemiller, Inc.*, 910 F. Supp. 2d 768, 774–75 (W.D. Pa. 2012) ("[T]he underlying purpose of the malfunction theory is to afford plaintiffs the opportunity to submit their case to a jury in cases where they lack direct evidence of the defect because the product is unavailable through no fault of their own. It was designed to prevent the automatic grant of summary judgment every time the actual product is destroyed, lost or otherwise unavailable through no wrongdoing on the part of a plaintiff . . .. In essence, the malfunction theory is intended to benefit those plaintiffs who did not have the benefit of examining the allegedly defective product . . . . Here, Plaintiffs are in possession of the actual gun and have subjected it to testing and examination by two experts, who they do not intend to call at trial. Thus, there is no need to "level the playing field" because Plaintiffs are *theoretically* capable of proving the alleged defect through direct evidence (the actual gun)." (citations and footnote omitted) (emphasis in original)).

In the matter currently before the Court, the RCM at issue has not been lost or destroyed. It has been in Plaintiff's possession since the collision. Tr. of Evidentiary Hearing (ECF No. 545) at 287.  The issue, here, is not the loss or destruction of evidence; rather, the *absence* of evidence. Coates' entire case hangs on the fact that RCM did not record the crash.

Like the *Roskop Dairy* court,[6] this Court has not located any cases applying the malfunction theory under Section 3 of the Third Restatement of Torts where the alleged defective product was not lost or destroyed. *See, also, L. Z. v. BigAirBag B.V.*, 691 F. Supp. 3d

---

*of Torts*. . . . In most instances the plaintiff will produce direct evidence of the product's defective condition. In some instances, however, the plaintiff may not be able to prove the precise nature of the defect in which case reliance may be had on the 'malfunction' theory of product liability. . . . It permits a plaintiff to prove a defect in a product with evidence of the occurrence of a malfunction and with evidence eliminating abnormal use or reasonable, secondary causes for the malfunction. . . . It thereby relieves the plaintiff from demonstrating precisely the defect yet it permits the trier-of-fact to infer one existed from evidence of the malfunction, of the absence of abnormal use and of the absence of reasonable, secondary causes. . . . We now accept this evidentiary approach as appropriate in ascertaining the existence of a defect in the manufacturing process." (citations and footnote omitted)). The analysis is the same as that employed under Section 3 of the Third Restatement of Torts.

[6] *Roskop Dairy, L.L.C.*, 871 N.W.2d at 799 ("While we have found little case law specifically addressing whether the malfunction theory applies when there is no loss of evidence or when there is an allegation of a specific defect, we find no cases that have done so. And we observe that the related doctrine of res ipsa loquitur does not apply when specific acts of negligence are alleged or there is evidence of the precise cause of the accident." (footnote omitted)).

451, 464 (D. Conn. 2023) (noting that "[t]he Connecticut Supreme Court has declined to decide whether a plaintiff can state a claim under the malfunction theory 'when the product is still available for inspection but the plaintiff nevertheless is unable to produce direct evidence of a specific defect.' *Metro. Prop. & Cas. Ins. Co.*, 302 Conn. at 132 n.4. Lower Connecticut state courts and federal courts in this district, however, have generally permitted malfunction theories only when the product was destroyed or otherwise unavailable for inspection" (collecting cases)). However, in an abundance of caution, the Court will assume *arguendo* that Section 3 applies and analyze Coates' claim thereunder.

### 2. Defect at the time of sale

While it appears that the courts of Pennsylvania have not formally adopted Section 3 of the Third Restatement of Torts, as noted *supra*, they do recognize the malfunction theory of strict product liability, and their analysis is germane:

> In certain cases of alleged manufacturing defects, however, the plaintiff need not present direct evidence of the defect. When proceeding on a malfunction theory, the plaintiff may "present a case-in-chief evidencing the occurrence of a malfunction and eliminating abnormal use or reasonable, secondary causes for the malfunction." *O'Neill v. Checker Motors Corp.,* 389 Pa. Super. 430, 435, 567 A.2d 680, 682 (1989). See also: *Knight v. Otis Elevator Co.,* 596 F.2d 84, 89 (3d Cir. 1979). From this circumstantial evidence, a jury may be permitted to infer that the product was defective at the time of sale. *Vernon v. Stash, supra* at 48, 532 A.2d at 448.

*Ducko v. Chrysler Motors Corp.*, 639 A.2d 1204, 1205 (Pa. Super. Ct. 1994). *See, also, e.g., Dansak v. Cameron Coca-Cola Bottling Co.*, 703 A.2d 489, 496 (Pa. Super. Ct. 1995) (explaining "Thus, in a products liability case the plaintiff seeks to prove, through whatever means he or she has available under the circumstances of the case, that a product was defective when it left the hands of the manufacturer. In some cases, the plaintiff may be able to prove that the product suffered from a specific defect . . . In some cases, the plaintiff . . . may be able to convince a jury that the product was defective when it left the seller's hands by producing circumstantial evidence. Such circumstantial evidence includes (1) the malfunction of the product; (2) expert testimony as to a variety of *possible* causes; (3) the timing of the malfunction in relation to when the plaintiff first obtained the product; (4) similar accidents involving the same product; (5) elimination of other possible causes of the accident; and (6)

proof tending to establish that the accident does not occur absent a manufacturing defect . . .. However the plaintiff chooses to present his or her case, the goal is the same: *to prove that the product was not only defective, but that such defect existed when it left the hands of the seller*" (citation omitted) (emphasis added)); *Ellis*, 910 F. Supp. 2d at 775 (where the court quotes *Dansak*: "Regardless of whether the malfunction theory applies in this case, 'the goal is the same: to prove that the product was not only defective, but that such a defect existed when it left the hands of the seller'"). Thus, the Court underscores that, even under a malfunction theory of liability, a plaintiff still must show not only that the product was defective, but also that the claimed manufacturing defect existed at the time of sale by the original seller/manufacturer. RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY, § 3, cmt d. ("Evidence may permit the inference that a defect in the product at the time of the harm-causing incident caused the product to malfunction, but *not* the inference that the defect existed at the time of sale or distribution. Such factors as the age of the product, possible alteration by repairers or others, and misuse by the plaintiff or third parties may have introduced the defect that causes harm.") (emphasis added)); *see also, e.g., Malcolm v. Regal Ideas, Inc.*, CIVIL ACTION NO. 19-239, 2021 U.S. Dist. LEXIS 39241, at *5-6 (E.D. Pa. Mar. 2, 2021) ("To establish a manufacturing defect, a plaintiff must prove that 'a seller (manufacturer or distributor) placed on the market a product in a defective condition.'" (quoting *Tincher v. Omega Flex*, 104 A.3d at 384 (Pa. 2014) (internal quotation marks omitted)); *Scanlon v. Gen. Motors Corp.*, 326 A.2d 673, 682 (N.J. 1974) ("However, this did not end plaintiff's burden with regard to the product itself. He still had to show that the defective condition existed while in the control of the defendants." (citing *Jakubowski v. Minn. Mining & Mfg*, 199 A.2d 826, 829 (N.J. 1964)); *Living & Learning Ctr., Inc. v. Griese Custom Signs, Inc.*, 491 A.2d 433, 435 (Conn. App. Ct. 1985) ("The mere fact that there is sufficient evidence to infer a defect does not necessarily mean that there is sufficient evidence to infer that the defect existed at the time of sale.")

Here, even if Plaintiff presents enough evidence to convince a jury that the airbags in her 2002 Ford Explorer "spontaneously" deployed due to a defect of the RCM at the time of the collision underlying this proceeding, she has adduced no evidence to infer that the

alleged defect existed at the time the vehicle was bought by the original purchaser in 2002. As comment d to Section 3 of the Third Restatement explains, "Such factors as the age of the product, possible alteration by repairers or others, and misuse by the plaintiff or third parties may have introduced the defect that causes harm." In most cases, "[t]he questions of when and where a defect originated will be left to the jury." *Living & Learning Centre, Inc.*, 491 A.2d at 435 (citation omitted). However, "[w]here the answers to these questions would be based only on speculation or conjecture, however, the answers cannot stand. *Id.* at 435-36 (citation omitted). As the New Jersey Supreme Court observes:

> Generally speaking, the older a product is, the more difficult it is to prove that a defect existed while in the control of the manufacturer. No product is intended to last indefinitely and many products require care and maintenance to perform at the same level as they did when new. With many products proof that the defect arose while in the hands of the manufacturer becomes very difficult, if not impossible, after a certain age; however, in certain situations mere age alone may not be sufficient to preclude an inference of a defect existing in the hands of the manufacturer. The product itself must be of a type permitting the jury, after weighing all the evidence and particularly the other factors referred to in the preceding paragraph, to infer that in the normal course of human experience an injury would not have occurred at this point in the product's life span had there not been a defect attributable to the manufacturer.

*Scanlon,* 326 A.2d at 678-79 (footnote omitted).[7]

In the matter at bar, regarding the history of the vehicle, Plaintiff concedes that: 1) after the original purchase in 2002, the vehicle was sold to a second buyer in 2005; 2) the vehicle then was purchased by her son-in-law, Alvin Ross (with money provided by Coates), in North Carolina and registered in his name in 2009; 3) the engine was removed/replaced in December 2003; 4) the body electrical wiring was repaired in 2004; 5) Coates was involved in collision with another vehicle in 2015 and had the damage repaired; 6) at the time of the collision at issue in this matter, the front driver's seat had been replaced; and 7) the seat belt buckle pretensioner was never reconnected. Ford's SUMF (ECF No. 420-1) at ¶¶

---

[7] The *Scanlon* court adds, in the omitted footnote: "In an appropriate case, proof that the manufacturer is responsible for the defect may be established by circumstantial evidence without reference to the product's age. . . . However, this would be the exception rather than the rule, the product's age being of considerable significance." *Scanlon*, 326 A.2d at 679 n.4.

37-40, 45-50; Coates' Response in Opposition to Ford's Statement of Material Facts, and Concise Statement of Additional Facts (ECF No. 449) at ¶¶ 37-40, 45-50. In addition, the CarFax Vehicle History Report, generated on or about June 1, 2018, contains an entry dated March 3, 2003, that reads: "Vehicle inspected after an accident or other incident Damage to left front." Ford's SUMF, Exhibit K (ECF No. 420-12). The CarFax Report also includes a "Last reported odometer reading" of 93,477, listed under Owner 2. *Id.*

The summary judgment evidence in this case is analogous to the evidence presented to the court in *Kuisis* v. *Baldwin-Lima-Hamilton Corp.*, 319 A.2d 914 (Pa. 1974).[8] There, the plaintiff was injured when a load of steel pipe fell on him due to the alleged failure of a brake-locking mechanism on the crane from which the pipe was suspended. *Id.* at 917. The court recites the history of the crane, which was over 20-years old and notes that "the court below was of the opinion that the crane had undergone changes so substantial as to render speculative any conclusion that the alleged defective condition was present at the time of delivery." *Id.* at 921. After remarking that the "'jury may not be permitted to reach its verdict merely on the basis of speculation or conjecture, but . . . there must be evidence upon which logically its conclusion may be based . . . '", *id.*, at 922 (citations omitted), the court declares:

> [T]he question is whether a jury could reasonably draw the inference that the brake locking mechanism was defective when the crane was delivered to North Star. We think that any such conclusion would be no more than a guess. Section 402A does not make manufacturers and sellers insurers of their products. They are not liable for defects caused by normal wear-and-tear or misuse of a product by its purchaser, however foreseeable these events may be. Here, the vicissitudes of over twenty years of rugged use of the crane make these possible sources of the alleged defect in the locking device no less likely than an error in manufacture or design. . . . We recognize that, as a general rule, "prolonged use of a manufactured article is but one factor, albeit an important one, in the determination of the factual issue whether [a defect in design or] manufacture proximately caused the harm." *Pryor v. Lee C. Moore Corp.*, 262 F.2d 673, 675 (10th Cir. 1958). The age of an allegedly defective product must be considered in light of its expected useful life and the stress to which it has been subjected. In most cases, the weighing of these factors should be left to the finder of fact. But in certain situations the prolonged use factor

---

[8] Although the *Kuisis* court analyzed the strict product liability claim through the lens of Restatement (Second) of Torts, § 402A, as indicated *supra*, the malfunction theory analysis is the same for Section 3 of the Third Restatement of Torts.

> may loom so large as to obscure all others in a case. Professor Prosser has
> summarized the position generally taken by the courts on this question:
> "[Lapse of time and long continued use] in itself is not enough, even when it
> has extended over a good many years, to defeat the recovery where there is
> satisfactory proof of an original defect; but when there is no definite evidence,
> and it is only a matter of inference from the fact that something broke or gave
> way, the continued use usually prevents the inference that the thing was more
> probably than not defective when it was sold." . . . Were there any direct
> evidence of a specific defect in the brake locking mechanism at the time of
> delivery, the age of the crane would not, as a matter of law, defeat liability, but
> in the absence of such evidence in the record before us, we do not think
> appellant has made out a case for the jury.

*Id*. at 922-23 (footnotes omitted). Here, Coates, unlike the plaintiff in *Kuisis*, has produced no

evidence of a previous failure of the RCM. *Id*. at 923 (discussing that "a malfunction of the

locking device had occurred about four years after the purchase of the crane, under different

conditions from the accident which resulted in Kuisis' injuries"). In addition, the evidence

shows continuous prolonged use of the vehicle for over 14 years, traveling well over 93,000

miles, with no indication that the RCM was defective.

The age and prolonged use of the vehicle might on its own bar the application of the

malfunction theory; the addition of the modifications and major repairs of the vehicle during

the period from manufacture to the date of the collision tips the balance in favor of

disallowing Coates to rely upon the theory. As the United States Court of Appeals for the

Ninth Circuit observes, "The rule is appropriately invoked only when the product 'is

unchanged from the condition it was in when sold and the unusual behavior of the product

is not due to any conduct of the part of the plaintiff or anyone else who has a connection with

the product.'" *Hall v. Gen. Motors Corp*., No. 91-36053, 1993 U.S. App. LEXIS 27314, at *7 (9th

Cir. 1993) (quoting *Brownell v. White Motor Corp*., 490 P.2d 184, 187 (Or. 1971)). In the face

of the vehicle's history, Coates has not offered any evidence to show that the age of the

vehicle, combined with the continued use without incident as well as the extensive repairs

and other changes to the vehicle, did not impact the RCM and that the RCM was in the same

condition as it was when it was installed by Ford. In fact, Coates' expert, Chris Caruso

("Caruso"), testified that there were "historical fault codes" that "showed this RCM . . . has

had problems." Tr. of Oral Dep. of Chris Caruso, taken September 29, 2023, at 21-25 (copy of

which is attached to Ford's Mem. as Exhibit C (ECF No. 420-4 at 7-8).) Although Caruso concluded that "[t]here is no reasonable explanation to explain why there is no crash recording and therefore that there had to be something defective *at the time* that resulted in the failure to record," *id*. at 126 (emphasis added), he says nothing about the RCM being defective at the time of manufacture. He also attests that, not only are there internal failures of the RCM, "there are other things external that we now know can influence the performance of the RCM and end up with catastrophic outcomes . . .. [W]e're now aware of at least one external condition that can render the RCM into a mode where it no longer functions as expected." *Id*. at 145-46. Caruso also stated that the RCM could misinterpret an event and deploy the airbags, for example, a "big rock or if there is something laying across the road and you're driving along and you run over this thing and it hits the undercarriage, you get enough g level to cause safing, but because the RCM also has its own capability of discrimination, if you get the right shape, even though it's just a short duration shock pulse, you can command a deployment and safe at the same time." *Id*. at 171. All of these statements undermine any jury finding that any alleged defect existed at the time the Explorer was initially sold in 2002.

The Court finds that, given the undisputed facts in this case and this expert's testimony, a jury inferring that the deployment of the airbags was a result of a manufacturing defect of the RCM at the time of the original sale would be "based on guess, speculation, conjecture, or a choice of possibilities [that] do not create material issues of fact for the purposes of summary judgment . . . ." *Roskop Dairy, L.L.C.*, 871 N.W.2d at 793.[9] Consequently,

---

[9] The opinion of the Superior Court of Pennsylvania in *Barnish v. KWI Bldg. Co.*, 916 A.2d 642 (Pa. Super. Ct. 2007), discussing *Kuisis* and *Woodin v. J.C. Penney Co.*, 629 A.2d 974 (Pa. Super. Ct. 1992) *aff'd, Barnish v. KWI Bldg. Co.*, 980 A.2d 535, 542 (Pa. 2009), is instructive:

> [N]oting that the crane had been in use for over twenty years, the *Kuisis* court concluded that a jury could not reasonably draw the inference that the brake locking mechanism on the crane was defective when it was originally delivered by the manufacturer. *Id*. at 922. Even though the plaintiff presented circumstantial evidence of a defect at the time of sale (*i.e.*, a safety engineer who examined the brake two years after the accident and found no evidence of wear, and evidence of an accident under different conditions that occurred four years after the sale of the crane), the court concluded that "[v]iewed against the record as a whole, these slender evidentiary threads are not enough to lift this contention out of the realm of speculation[,]" given the fact that the crane had been in rugged use for over twenty years. *Id*. at 923.

the Court finds that Coates has not made a showing of a manufacturing defect at the time of the original sale sufficient to survive summary judgment.

### 3. Defect caused the injury

The Court reiterates that the "malfunction theory does not alter the basic elements of the plaintiff's burden of proof and is not a means to prove proximate cause or damages."

*Roskop Dairy, L.L.C.*, 871 N.W.2d at 797. As the *Roskop* court elucidates,

> Proximate cause is the cause that in a natural and continuous sequence unbroken by an efficient intervening cause, produces the injury, and without which the injury would not have occurred. To establish proximate cause, the plaintiff must meet three basic requirements: (1) Without the negligent action, the injury would not have occurred, commonly known as the "but for" rule or "cause in fact"; (2) the injury was a natural and probable result of the negligence; and (3) there was no efficient intervening cause.

*Id.* at 794 (footnotes omitted). *Accord Sealey-Christian v. Sunny Isle Shopping Ctr., Inc.*, 52 V.I. 410, 432 (V.I. 2009) ("Proximate cause is established where the party who bears the burden shows that 'an original act is wrongful or negligent and in a natural and continuous sequence

---

Similarly, in *Woodin*, this Court determined that the evidence presented was insufficient to prove a defect in a freezer at the time of its manufacture and sale. Specifically, the plaintiffs claimed that a fire in their home was caused by a defective power cord on their freezer. However, the plaintiffs could not identify a specific defect in the power cord, and the freezer had functioned flawlessly for eight years prior to the fire. Accordingly, we agreed with the trial court that the jury could not reasonably infer the existence of a defect merely based on the occurrence of the fire. Any conclusion to the contrary would be mere speculation, as there was no evidence to support a finding that the freezer was defective when it was sold to the plaintiffs. *See Woodin*, 629 A.2d at 976-77. . . . Viewing the facts in the light most favorable to Plaintiff/Appellants, we conclude that the trial court did not commit an error of law or abuse its discretion in granting summary judgment to GreCon because a jury could not reasonably infer the existence of a defect in the sensors when they left GreCon's hands ten years prior to the malfunction of the sensors. This is so because Plaintiff/Appellants conceded that the sensors functioned properly during that ten year period, and Plaintiff/Appellants failed to present any satisfactory proof of an original defect. *Kuisis*, 319 A.2d at 923.

*Barnish*, 916 A.2d at 647-48. As the Pennsylvania Supreme Court stated in affirming the lower court, "a plaintiff's acknowledgment of prior successful use undermines the inference that the product was defective when it left the manufacturer's control." *Barnish*, 980 A.2d at 547. *See also Varner v. MHS, Ltd.*, 2 F. Supp. 3d 584, 593 (M.D. Pa. 2014) ("The age of a product should be considered in light of its expected life and the stress to which it has been subjected. *Kuisis*, 319 A.2d at 923. 'In most cases, the weighing of these factors should be left to the finder of fact.' Id. To survive summary judgment, a plaintiff who admits that the product functioned properly in the past must present some evidence explaining how the product could be defective when it left the manufacturer's control and yet still function properly for a period of time.").

produces a result which would not have taken place without the act[.]'" (quoting *Clinger v. Duncan*, 141 N.E.2d 156, 162 (1957)).

> The comments to Section 3 of the Third Restatement of Torts advise:
>
> [T]he plaintiff must establish by a preponderance of the evidence that the incident was not solely the result of causal factors other than defect at time of sale. The defect need not be the only cause of the incident; if the plaintiff can prove that the most likely explanation of the harm involves the causal contribution of a product defect, the fact that there may be other concurrent causes of the harm does not preclude liability under this Section. But *when the harmful incident can be attributed solely to causes other than original defect, including the conduct of others, an inference of defect under this Section cannot be drawn*.

RESTATEMENT (THIRD) OF TORTS: PRODUCT LIABILITY, § 3, cmt d. (emphasis added). *See also Ocean Barge Transport Co. v. Hess Oil Virgin Islands Corp*., 726 F.2d 121, 125 (3d Cir. 1984) ("[T]he malfunction theory in no way relieves the plaintiff of the burden of proving a defect: it simply allows him to show that a defect is the most likely explanation for an accident by eliminating other reasonable explanations." *quoted in Walker v. General Elec. Co*., 968 F.2d 116, 120 (1st Cir. 1992); *Scanlon*, 326 A.2d at 679 ("To make out a case by negating other causes of a product's failure it is not necessary that all possible causes be negated by the plaintiff. What is required is that the most likely causes were not in fact responsible for the accident." (citations omitted)); *Hirschbeck v. Wright Med. Tech., Inc*., CV055000410S, 2011 Conn. Super. LEXIS 416, at *27-28 (Conn. Super. Ct. Feb. 18, 2011) ("[A] plaintiff is not required to eliminate with certainty other causes. Instead, he must proffer evidence sufficient to allow the fact finder to reasonably infer that a product defect was the most likely cause of the product failure." (citations omitted)). Ford argues that the most likely cause of the deployment of the airbags is the crash into the hillside. Coates has not presented any evidence, either direct or circumstantial, that corroborates her claim that the airbags deployed prior to the crash.

Ford contends that the sensing function and the recording function of the RCM are separate and distinct functions. Ford's SUMF at ¶¶ 16-18. Caruso, Coates' expert, acknowledged that "the recording functions and the detection functions are separate functions" and that "the ability of the RCM to detect the event is not dependent at all on

whether it records the event." Tr. of Oral Dep. of Chris Caruso, taken September 29, 2023, at 30 (a copy of which is attached to Ford's SUMF as Exhibit C (ECF No. 420-4)). In response to the question, "Can you tell me all the evidence you have that shows the RCM failed to detect the crash event as opposed to simply failing to record it?", Caruso replies, merely using circular reasoning: "I'm just looking, it [i.e., the recorded data] says well, it did not command the restraints deployment. It did not record any crash or acceleration data. It did not record any event related diagnostic codes. So fundamentally the download is telling us that it knows of no crash." *Id.* at 164. He also admits, "We're back to this issue that we don't have any data to support anybody's opinions unfortunately. Again, the lack of the crash recording is the Achilles heel of this case." *Id.* at 80. Another expert, Richard Rakes, a former Ford airbag calibration engineer, agreed that the mere "fact that the RCM did not record a commanded deployment is not proof that the RCM was defective," only that "there was not a crash recording." Tr. of Oral Dep. of Richard Rakes, taken October 3, 2023, at 64 (a copy of which is attached to Ford's SUMF as Exhibit H (ECF No. 420-9)).

In addition, the undisputed evidence demonstrates that the RCM is connected to sensors, including, in this case, a front crash sensor. Yet, no inspection or testing of the sensors was undertaken. *See* Tr. of Oral Dep. of Chris Caruso, taken September 29, 2023, at 185 (where Caruso claims, "[I] have no reason to believe the front sensor has an internal failure. It would still nice [sic] to test it, make sure it's functional . . . . [N]obody has told me no, but I think I just proffered this up a couple months ago like, hey, the only thing I have left that we could do is maybe look at the sensors themselves. I never pushed it hard. So obviously we never went anywhere with it") and 78-79 (where, in response to the question, "Is there anything you proposed testing in this case that you decided not to?", Caruso states: "At this point, you know, about the only thing that you could think of doing is, you know, trying to get access to that front sensor and get that front sensor removed from the vehicle and maybe do some off-line testing of the front sensor. You know, pull the RCM out, take it to, you know, Autoliv or whoever would be the one and, you know, try to identify what was causing those historical fault codes. Is there a defective ASIC or other chip inside this module that's periodically resulting in these diagnostic trouble codes. Other than that, I mean there

is no crash testing that I would be authorizing or anything like that. Pretty much just trying to see if there's any indication at the sensor level that something is not quite right, that the system is not acting normally. Other than that, no. And I have not asked for that testing. I'm just offering you, if I was to think of anything that I might want to do, it would be to look closer at the sensors").

Another Coates' expert, Kelly Kennett, opined that the "RCM's 'download *appears consistent* with Ms. Coates' assertion of spontaneous pre-impact [airbag] deployment' (emphasis added); Exhibit C, Chris Caruso depo. at pp. 189:9-21." Ford's SUMF at ¶ 25. Yet, given the separate sensing and recording functions of the RCM, Coates has not explained how the non-recording of an event automatically implies a defect in the sensing function or how the deployment of the airbags was not the RCM correctly sensing the collision with the hillside. *See Conklin v. Harley-Davidson Motor Co. Grp., LLC*, CIVIL ACTION NO. 3:20-1712, 2023 U.S. Dist. LEXIS 176732, at *11-12 (M.D. Pa. Sept. 28, 2023) ("The malfunction theory also requires the plaintiff to put forth 'evidence eliminating reasonable secondary causes for the accident.' *Altronics of Bethlehem, Inc. v. Repco, Inc.*, 957 F.2d 1102, 1105 (3d Cir. 1992). '[T]he plaintiff need not negate every theoretically conceivable secondary cause for the accident in question; rather, the plaintiff fails to establish a *prima facie* case only where the offered proof in itself fairly raises the possibility of secondary causes and then fails to negate the inference that more than one cause could account for the accident.' *Walters*, 209 F.Supp.2d at 487 (citing *Dansak*, 703 A.2d at 497).)." In this regard, the facts in this matter, where the only evidence of the airbags deploying prior to the crash is Coates' own testimony, are similar to the facts in *Williams v. Smart Chevrolet Co.*, 30 S.W.2d 479 (Ark. 1987), where, as cited by the Superior Court of Connecticut, the "plaintiff alleged that a defect existed in her car door, since it flew open while she was driving. . . . [However], the only evidence introduced by the plaintiff to negate other causes was her own testimony that she was certain that she shut and locked her car door. The court held that this evidence did not adequately negate other causes." *Hirschbeck v. Wright Med. Tech., Inc.*, CV055000410S, 2011 Conn. Super. LEXIS 416, at *24 (Conn. Super. Ct. Feb. 18, 2011).

*Coates v. Ford Motor Co.*
Case No. 3:21-cv-0063
Memorandum Opinion
Page 20 of 21

The mere failure of the RCM to record the crash does not lead inexorably to the conclusion that its sensing or detection function malfunctioned and spontaneously deployed the airbags. Clearly, there was a crash event when Coates' vehicle collided into the hillside. The Court finds that Coates has failed to introduce sufficient evidence for a jury to infer that an alleged defect in the RCM was the most likely cause of the airbags deploying rather than the collision itself. Consequently, the Court finds that Coates fails to carry her burden under Section 3. The Court also finds that Coates cannot establish that any alleged defect in the RCM was the proximate cause of her injuries. *See, e.g., Roskop Dairy, L.L.C.*, 871 N.W.2d at 799 (where the court declares, "In any event, the malfunction theory would not serve to create a material issue on the element of proximate cause, because it is a theory only utilized to prove the element of defect" (footnote omitted)).

Even if Coates could convince a jury that the airbags deployed prior to the crash, Coates fails to eliminate another secondary cause, namely the age of the vehicle, wear and tear, and repairs and changes to the vehicle, including to the electric wiring. *See, e.g., Schlier v. Milwaukee Electrical Tool Corp.,* 835 F. Supp. 839 (E.D. Pa. 1993) ("As discussed above, plaintiff's case-in-chief must also have been free of secondary causes or abnormal use which could account for the accident. Based on plaintiff's own evidence, there is at least one secondary cause which could account for the accident. Specifically, there was evidence in plaintiff's case-in-chief of wear and tear of the saw."). While Coates' experts focused on the absence of evidence, specifically, crash data and loss of power to the RCM, none ruled out the factors of the age, mileage, wear and tear, modifications, and repairs of the vehicle as a possible cause of any alleged "spontaneous" deployment of the airbags.

Based upon the foregoing, the Court finds that Coates has not demonstrated a genuine issue of material fact and, thus, that Ford is entitled to summary judgment as to Count I of the SAC.

## IV. CONCLUSION

Because the Court finds that Coates fails to provide evidence sufficient for a jury to infer that an alleged defect in the RCM, that existed at the time of the original sale of the vehicle in 2002, was the most likely cause of the deployment of the vehicle's airbags, the

*Coates v. Ford Motor Co.*
Case No. 3:21-cv-0063
Memorandum Opinion
Page 21 of 21

Court will grant Ford's motion for summary judgment as to Count I. An appropriate order

follows.

**Dated:** March 28, 2025                    */s/Robert A. Molloy*
                                             **ROBERT A. MOLLOY**
                                             **Chief Judge**